FILED

16 NOV 23 PM 2:00

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

AARON PACHITO,

                    Petitioner,

v.

CYNTHIA Y. TAMPKINS,

                    Respondent.

Case No.: 15cv2457-JAH(KSC)

**REPORT AND RECOMMENDA-TION RE PETITION FOR WRIT OF HABEAS CORPUS**

    Petitioner Aaron Pachito, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus ("Petition") challenging his December 12, 2012 jury conviction in San Diego County Superior Court Case No. SCD233973 for making criminal threats in violation of California Penal Code Section 422. [Doc. No. 10-1, at p. 158.]

    This Court has reviewed the Petition and exhibits [Doc. No. 1]; respondent's Answer and supporting Memorandum of Point and Authorities [Doc. No. 9]; the Lodgments submitted by respondent, including the state court record [Doc. No. 10]; and petitioner's Reply and supporting Memorandum of Points and Authorities [Doc. No. 11]. For the reasons outlined below, IT IS HEREBY RECOMMENDED that the District Court DENY the Petition in its entirety.

///

///

1

### *PROCEDURAL HISTORY*

On November 30, 2011, petitioner was charged in an Amended Information with one count of making a criminal threat in violation of California Penal Code Section 422. [Doc. No. 10-1, at pp. 10-11.]  On December 12, 2012, a jury found petitioner guilty of making a criminal threat.  [Doc. No. 10-3, at p. 17; Doc. No. 10-13, at pp. 8-9.] Petitioner was sentenced to a total of eleven (11) years in state prison.  [Doc. No. 10-14, at p. 33.]  To reach the total of eleven (11) years, the trial court imposed three years for the violation of Section 422, doubled to six years because petitioner had a prior conviction that qualified as a strike under California's Three Strikes law, and then added another five years because petitioner had a prior conviction that qualified as a serious felony under California Penal Code Section 677(a)(1).  [Doc. No. 10-1, at p. 158; Doc. No. 10-14, at p. 33.]

On direct appeal, petitioner argued that:  (1) the evidence is constitutionally insufficient to support the verdict; (2) the trial court erred in failing to instruct the jury on a lesser included offense; (3) the trial court erred in admitting prior conviction evidence; (4) the trial court erred in giving instructions concerning petitioner's pre-trial statements; (5) the trial court improperly admitted prior acts evidence; and (6) cumulative errors adversely affected the jury's verdict. [Doc. No. 10-15, at p. 2-3.]  The California Court of Appeal affirmed the judgment in an unpublished opinion filed on October 27, 2014. [Doc. No. 10-17, at pp. 1-31.]  Petitioner raised the same arguments in a Petition for Review before the California Supreme Court.  [Doc. No. 10-18, at pp. 2-3.]  The California Supreme Court summarily denied the Petition for Review on January 21, 2015. [Doc. No. 10-19, at p. 1.]  The Petition in this case was then filed on October 28, 2015, raising only the sufficiency of the evidence claim.  [Doc. No. 1.]

### *FACTUAL BACKGROUND*

In reviewing a federal Petition for Writ of Habeas Corpus, this Court gives deference to the state court findings of fact and presumes them to be correct.  Petitioner may rebut this presumption of correctness, but only by clear and convincing evidence.

28 U.S.C. 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992). The following facts are taken from the California Court of Appeal's unpublished decision denying petitioner's direct appeal in Case No. D063925 (San Diego Superior Court Case No. SCD233973).

Durae Delisle and [petitioner] began a relationship in 2007, and she gave birth to their daughter, N.P., in 2009. [Petitioner] has a history of domestic violence toward Delisle, particularly when under the influence of alcohol.

In the spring of 2008, he slapped her in the face after hearing a message a man left on her phone. A few months later, he threw a cup of coffee at her face. It split her lip and broke a front tooth, requiring a root canal. In December 2008, he came home from a sporting event 'very, very drunk,' 'went on and on' about how much he hated her religion, and struck her 'very hard' on the side of her head, popping her eardrum. As she lay on the floor crying, he kicked her and smashed her head several times into a cupboard. She went to urgent care, and had pain in her ear for two to three weeks and difficulty hearing.

On December 12, 2008, an officer with the San Diego Police Department responded to a call from Delisle. She had been crying, and she told the officer that she broke up with [petitioner] a few days earlier and he 'wanted to physically fight with her and punch her face.' She reported the cup incident to the officer.

In February 2009, when Delisle was two months pregnant, [petitioner] punched her in the stomach because he was upset about the pregnancy. About a month later, he became upset because she was crying while reading an e-mail. He was drunk, and he put both hands around her neck and choked her 'really bad' until she 'start[ed] to get dizzy.' He stopped for a few seconds, but then resumed choking her. She knew from experience that if she pretended to be calm he would calm down.

In approximately April 2010, [petitioner] punched Delisle in the leg while she was seated on a bed along with N.P. He had agreed to stop drinking and abusing her. He was not drinking this time, which made her believe he would never stop the abuse. After this incident she took N.P. and left the area for several months.

At one point, Delisle went to Seattle, Washington, and stayed with a friend. [Petitioner] joined her in Seattle and they spent the night in a hotel. The following day 'he got really mad that he was spending so much money on hotel rooms' when he could be staying at the friend's house. The friend was afraid of [petitioner] and Delisle promised not to reveal the friend's address to him. He screamed at her as she was driving, and she pulled over and told him to get out of the car. He refused. She went into a cafe and called the police because she was afraid of him. When they arrived, he fled.

In September 2010, Delisle returned to San Diego because she wanted to get orders for custody and child support. In October 2010, she reported to a police officer that 'she got into an argument with her boyfriend, and he pushed her while she was holding their one-year-old daughter.' She told the officer '[s]he was afraid of him and ran out of the house to the neighbor's house next door and had the neighbors call 911.'

In January 2011, Delisle obtained a restraining order against [petitioner]. According to Delisle, child protective services intended to remove N.P. from her custody unless she obtained one. Delisle and [petitioner] agreed he would have reasonable visitation with N.P.

[Petitioner] broke the restraining order by calling her 'nonstop' about resuming their relationship. She did not want to do so because he was 'drinking continuously,' and sometimes when he drank he was 'very violent.'

In January 2011, Delisle reported to a police officer that he made 35 calls to her within a few hours. The officer arrested [petitioner] for violating the restraining order. [Petitioner] told the officer he knew about the order, but he continued to call her because he 'needed to know whether or not she was dating someone else so that if she was, he could move on with his life.' He admitted to the officer that he had physically abused her.

In one of [petitioner]'s calls to Delisle, he commented that he could pick the lock of her apartment door. That concerned her because she lived in 'a very old building' and 'it would have been so easy to break inside.' She asked the police to give her safety tips, and they helped her with window locks and showed her 'how to block a door with a chair.'

One night in February or March 2011, Delisle left her apartment to retrieve something from her car. [Petitioner] was outside her apartment, and

he was 'very upset' because he had gotten into her e-mail account and saw she was corresponding with a man. He put one hand around her neck and choked her for approximately five seconds. After this incident, she obtained a criminal protective order against him.

The night of March 24, 2011, Delisle received between 10 and 15 phone calls while she was driving home. She believed they were from [petitioner] and she ignored them. When she arrived outside of her apartment she called him. She could tell from his tone of voice that he was 'very, very angry,' 'angrier than usual.' He wanted to see N.P. the following day, and Delisle had not called him for several days to schedule visitation.

During the call, [petitioner] stated, 'You're lucky you called me, you fucking bitch, because I was just about to come over there and knock down your front door and murder you.' He added, 'I'm not going to hurt you, I'm going to murder you, and the restraining order is not going to protect you and the police aren't going to protect you.' He also said something to the effect of, 'Why the fuck didn't you answer your phone after I called you 10 times, you fucking bitch.'

Delisle knew [petitioner] was at his home, which was approximately 10 to 15 minutes from her apartment by car. She testified, 'I was afraid he was going to come over,' and, 'when he's drinking, if he comes over to my house, it's not a good situation.' When asked whether he could be violent, she responded, 'Of course.' Further, child protective services had been at her home that morning, and she believed she should report the incident to avoid having N.P. removed from her custody. [Footnote 2: "Delisle testified child protective services had visited her three times after N.P.'s name showed up in police reports pertaining to petitioner's conduct."] She testified, 'I'm afraid of him. I'm afraid of child protective services. I'm afraid of there being proof that he's calling me and I'm not reporting it. I'm afraid of the whole situation. It's a nightmare.'

She decided to flag down a police officer to report the threats. She also decided to spend the night in a hotel, and as a 'safety precaution' she asked the officer, Cary Ochab, to escort her to her apartment and wait outside with N.P. while she grabbed some clothes. She paid approximately $60 for a room, money she would rather have had for other expenses. She returned home the next day and [petitioner] left her alone for several months. [Footnote 3: "The preliminary hearing was held in July 2011. The same month, Delisle contacted [petitioner] and asked him to pay his ordered child

support.  Between then and September of that year they saw each other about five times and had sexual relations twice.  He asked her to lie about his March 24, 2011, phone call, but she refused.  After he was rude to her, she ended the relationship because it reminded her 'of his old ways' and she was afraid the violence would resume.'"]

Officer Ochab testified Delisle 'appeared nervous, anxious, almost like physically shaking, like she was concerned about something.'  His report stated she told him [petitioner] said, 'Why the fuck didn't you answer the phone after I called you 10 times, you fucking bitch?  I was about to come over and knock down your front door and kill you.  I'm not going to hurt you, I'm just going to come over and murder you.'

While Delisle was speaking with Ochab, [petitioner] phoned her.  She put the call on speaker phone.  She told [petitioner] he should not be calling her, and he responded, 'I don't care if you have a restraining order.  It can't protect you,' and, 'I'm not afraid of the police.'  Ochab could 'hear a male's voice going on a rant, yelling and screaming over the phone, making some reference to seeing his daughter.'  Ochab attempted to interrupt [petitioner] several times, but he 'continued with his yelling and screaming.'

Ochab later phoned [petitioner] and 'asked him about the threat that he made and kind of cautioned him about making such threats, especially if he was concerned about child custody in the future.'  [Petitioner] asked Ochab, 'am I going out with her, if I was fucking her.'  [Petitioner] did not deny threatening Delisle, but said 'he would never hurt her.'  [Petitioner] 'tended to agree . . . that he should probably be a little more cautious with what he says towards Delisle.'  He asked Ochab 'numerous times if I could just drop the case.'

John Serrano, an investigator with the district attorney's office, conducted a recorded interview of Delisle in May 2011.  When asked whether she denied being afraid of [petitioner], Serrano testified, 'No.  She was definitely afraid of him.'  He added, 'She said that she was constantly having to watch her back; she wasn't sure if he was perhaps sitting down the street, watching her come home, so she was definitely fearful of him.'  Delisle told Serrano she was afraid to spend the night of March 24, 2011, at her home, 'and she said she wanted to spend the money [on a hotel room] to make sure that she was safe.'

15cv2457-JAH(KSC)

Josette Basso testified she and [petitioner] began a relationship in 2001 or 2002, and he was frequently violent toward her. The first time, they were driving when he became angry over something 'silly' and slapped her. In 2002 they went to Big Bear and were having a good time in a bar, when he became 'very upset' [because] he felt she stayed in the restroom too long. He ushered her outside, where they argued. He grabbed her by the back of her head and pushed her head into a wall.

In 2003, [petitioner] slapped Basso when she told him she had two male friends coming to visit from out of town. Later that evening, she heard [petitioner] 'screaming and yelling' that if she did not open her front door by the time he counted to 10 he was going to 'kick the door in.' He counted to five and kicked the door in, cracking it in half. He ran up the stairs and began choking one of her friends, who was sleeping on a couch. Basso threw her mobile phone to the friend and told him to call the police, at which point [petitioner] punched her, causing 'a very ugly black eye.'

[Petitioner] and Basso were once kicked out of a bar after he made derogatory remarks to the female bartender. He became angry and Basso did not feel safe so she left in her car. She parked on a residential street and waited, hoping he would 'sober up and be in a better mood later.' She eventually phoned him, and he told her to 'get to his house immediately.' He met her at her car, took her purse, and guided her into his apartment. He rifled through her purse for her car keys, but could not find them. When she refused his request for the keys, he punched her in the eye, causing profuse bleeding. He took her to a hospital and she required 19 stitches over her eye.

In April 2004, [petitioner] sent Basso threatening text messages, and then showed up at her home and threatened to hurt or kill her and her parents. At the time, a criminal case was pending against him for assaulting her, and he demanded that she not testify against him. She explained, 'I was scared for my life' because 'I believe he's capable of it.' She called the police, and the officer who responded retrieved text messages from Basso's phone that stated, 'F cunt, your dead same w family'; 'Liars, suffer or die!'; and, 'Kill you if you dare think cheating J no excuses!'

[Doc. No. 10-17, at pp. 2-9.]

/ / /

/ / /

15cv2457-JAH(KSC)

### *DISCUSSION*

I.    *Standard of Review.*

Federal habeas corpus relief is available only to those who are in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). "[A] mere error of state law is not a denial of due process." *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (internal quotations omitted).

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citations and quotations omitted). Under AEDPA, a habeas petition "on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim– (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)&(2). For purposes of section 2254(d)(1), "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Therefore, a lack of controlling Supreme Court precedent can preclude habeas corpus relief. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008).

The AEDPA standard is highly deferential and "difficult to meet." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Federal habeas relief may be granted under the "contrary to" clause of section 2254 if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the

Supreme Court "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). The focus of inquiry under the "contrary to" clause is "whether the state court's application of clearly established federal law is objectively unreasonable." *Id.* "[A]n unreasonable application is different from an incorrect one." *Id.* In other words, federal habeas relief cannot be granted simply because a reviewing court concludes based on its own independent judgment that the state court decision is erroneous or incorrect. *Id.* Habeas relief is only available under Section 2254(d)(1) "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts" with Supreme Court precedents. *Harrington v. Richter*, 562 U.S. at 102. In addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Where there is no reasoned decision from the state's highest court, Federal Courts "look through" to the "last reasoned state-court opinion" and presume it provides the basis for the higher court's denial of a claim or claims. *Ylst v. Nunnemaker*, 501 U.S. 797, 805-806 (1991). If the state court does not provide a reason for its decision, the Federal Court must conduct an independent review of the record to determine whether the state court's decision is objectively unreasonable. *Crittenden v. Ayers*, 624 F.3d 943, 947 (9th Cir. 2010). To be objectively reasonable, a state court's decision need not specifically cite Supreme Court precedent. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," the state court's decision will not be "contrary to clearly established Federal law." *Early v. Packer*, 537 U.S. 3, 8 (2002).

## II. *Review of Petitioner's Sufficiency of the Evidence Claim.*

### A. *Clearly Established Supreme Court Law.*

The clearly established Supreme Court law for evaluating sufficiency of the evidence claims is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). With reference to the Due Process clause of the Fourteenth Amendment, the Supreme Court in *Jackson*

9

*v. Virginia* held that the "relevant question" for a Federal Court reviewing a sufficiency of the evidence claim by a state prisoner is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 324 (emphasis in original). The role of the Federal Court on federal habeas review is not to re-weigh the evidence or to resolve conflicts in the testimony. "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Id.* at 319. "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

The sufficiency of the evidence "must be gauged in light of applicable [state] law defining the element[s]" of the offense. *Id.* at 324. California Penal Code Section 422 provides as follows: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." Cal. Penal Code § 422(a).

Under California law, "it is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422." *People v. Butler*, 85 Cal.App.4th 745, 753 (2008). "The

circumstances surrounding a communication include such things as the prior relationship
of the parties and the manner in which the communication was made." *In re Ryan D.*,
100 Cal.App.4th 854, 860 (2002). "To constitute a criminal threat, a communication
need not be absolutely unequivocal, unconditional, immediate, and specific. The statute
includes the qualifier 'so' unequivocal, etc., which establishes that the test is whether, in
light of the surrounding circumstances, the communication was sufficiently unequivocal,
unconditional, immediate, and specific as to convey to the victim a gravity of purpose
and immediate prospect of execution." *Id.* at 861.

### B.     *The Last Reasoned State Court Opinion.*

In its unpublished decision affirming petitioner's conviction, the California Court
of Appeal responded to petitioner's sufficiency of the evidence argument by applying a
standard of review equivalent to the standard set forth by the Supreme Court in *Jackson
v. Virginia*. [Doc. No. 10-17, at pp. 9, 13.] The California Court of Appeal concluded
that the circumstances presented were more than enough to support a conviction under
Section 422. [Doc. No. 10-17, at p. 12.] Although acknowledging that some of the
language petitioner used was "conditional," the California Court of Appeal noted that:
(1) Section 422 does not require an "unconditional" threat, because this would ignore the
statutory qualification marked by the use of the word "so"; and (2) petitioner also made
statements in the present tense that were not "conditional," such as "I'm not going to hurt
you, I'm going to murder you, and the restraining order is not going to protect you and
the police aren't going to protect you." [Doc. No. 10-17, at p. 12-13.]

Other evidence cited in the Court of Appeal's analysis included petitioner's history
of physically abusing the victim and her knowledge that he was capable of hurting her.
The Court of Appeal also noted that the victim testified she could tell by petitioner's tone
of voice that he was "very, very angry" and "angrier than usual" when he made the
statements in question. [Doc. No. 10-17, at p. 12.] In addition, the Court of Appeal cited
the responding police officer's testimony. He testified that the victim was "visibly upset"
when he arrived and he was able to hear petitioner "ranting" on the speaker phone. The

1   officer further testified that the victim was so frightened petitioner would actually show

2   up and harm her that she decided to spend the night in a hotel and requested a police

3   escort to pick up clothing at her apartment. [Doc. No. 10-17, at p. 12.]

4       *C.    Petitioner's Sufficiency of the Evidence Arguments.*

5           Petitioner believes the words he used during the telephone call with the victim at

6   the time in question are insufficient to support a conviction under Section 422, because

7   they were "conditional." [Doc. No. 1, at p. 23.] He objects to the California Court of

8   Appeal's reliance on the word "so" in Section 422 "to muddle the analysis." [Doc. No. 1,

9   at p. 23.] According to petitioner, the California Court of Appeal "ignore[d] the obvious

10  conditionality of the statement and focuse[d] on a fragment of it to find the immediacy

11  element" and "[t]his was not a fair or accurate reading of the record." [Doc. No. 1, at pp.

12  24-25.] Petitioner believes his words, when viewed as a whole, did not convey "the

13  prospect of immediate execution" of harm to the victim, particularly because he also

14  spoke about seeing his daughter the following day, which indicated his goal in contacting

15  the victim was to arrange to see his daughter. [Doc. No. 11-1, at p. 6-7; Doc. No. 10-17,

16  at pp. 5, 7; Doc. No. 10-9, at p. 65.] Instead, petitioner believes it is clear he only

17  intended to "chastise" the victim for not answering her phone and to talk to her about

18  visiting with his daughter. [Doc. No. 11-1, at p. 7.] There are at least two problems with

19  petitioner's contentions.

20          First, as noted above and in the California Court of Appeal's Opinion in this case,

21  petitioner's interpretation of Section 422 is contrary to California law. California courts,

22  including the California Supreme Court, have concluded that Section 422 does not

23  require an unconditional threat. [Doc. No. 10-17, at p. 11, citing *People v. Bolin*, 18

24  Cal.4th 297, 339 (1998).] In other words, petitioner's argument challenges the California

25  Court of Appeal's decision on an issue of state law. The California Supreme Court has

26  resolved this issue against petitioner, and issues of state law are not cognizable on federal

27  habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (reiterating that "federal

28  habeas corpus relief does not lie for errors of state law" and stating that "it is not the

15cv2457-JAH(KSC)

province of a federal habeas court to reexamine state-court determinations on state-law questions").

Second, petitioner's contention that the California Court of Appeal unfairly focused on some of his statements to the victim and ignored others in order to affirm his conviction is not a viable challenge to the sufficiency of the evidence to support the conviction. Specifically, petitioner contends that the California Court of Appeal focused on his unconditional statements to the victim (*i.e.*, that "I'm not going to hurt you, I'm going to murder you, and the restraining order is not going to protect you and the police aren't going to protect you") and unfairly ignored his remaining "*past conditional*" statements (*i.e.*, that "[y]ou're lucky you called me, you fucking bitch, because I was just about to come over there and knock down your front door and murder you"). [Doc. No. 10-17, at pp. 5-6, 12-13; Doc. No. 1, at p. 23 (emphasis in original).] Petitioner believes these "*past conditional*" statements "did not convey the prospect of immediate execution" that is required under Section 422. [Doc. No. 1, at p. 23-24 (emphasis in original).] In addition, petitioner believes that the Court of Appeal ignored testimony indicating the purpose of his telephone call to the victim was to arrange for visitation with his daughter. [Doc. No. 1, at p. 42.] At most, petitioner has cited conflicting evidence in the record, and, as explained above, the standard of review set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, does not permit a reviewing court to re-weigh or resolve conflicts in the evidence. Rather, a reviewing court must presume that the trier of fact resolved any conflicts in favor of the prosecution. *Id.* at 326.

Petitioner's other "factual omission" arguments similarly challenge the weight or emphasis afforded conflicting evidence in the record. [Doc. No. 1, at pp. 23-26.] For example, petitioner argues there is insufficient evidence to indicate the victim suffered from "sustained fear" as a result of his words at the time in question, because she testified she did not always take his words literally and he said things "all the time" that she knew not to take seriously. [Doc. No. 1, at p. 25; Doc. No. 10-11, at pp. 46-48; Doc. No. 11-1, at p. 8.] In addition, the victim testified she "wasn't thinking that [petitioner] was going

1  to come over or not come over" at the moment when she contacted the police officer.
2  [Doc. No. 10-11, at pp. 48-49; Doc. No. 11-1, at p. 8-9.]  She said she had been
3  contacted by child protective services (CPS) the same day, and she was afraid they were
4  going to take her daughter away if he came over to her house and she let him come
5  inside.  Her fear of CPS was equal to her fear of petitioner.  [Doc. No. 10-11, at pp. 49-
6  53.]  In connection with a separate issue petitioner raised on direct appeal, the California
7  Court of Appeal concluded this testimony was "unavailing because it [did] not pertain to
8  [petitioner's] threats of March 24, 2011.  It was merely general information about their
9  relationship."  [Doc. No. 10-17, at p. 14.]

10        Once again, it is apparent that petitioner's view is that sufficient weight was not
11  afforded the victim's conflicting testimony indicating she did not always take his words
12  seriously and did not necessarily believe he would go over to her house after threatening
13  her on the telephone.  The cited testimony only indicates there is conflicting evidence in
14  the record on the victim's state of mind.  As noted above, other testimony indicated the
15  victim was afraid of petitioner because of their history and was so afraid petitioner would
16  go over to her home after he made the threatening statements to her on the telephone that
17  she flagged down a police officer, decided to spend the night in a hotel, and asked the
18  police officer to escort her to her apartment and wait outside while she grabbed some
19  clothes.  [Doc. No. 10-17, at pp. 6-7.]  As noted above, when the record includes
20  conflicting inferences, a reviewing court "must presume – even if it does not
21  affirmatively appear in the record – that the trier of fact resolved any such conflicts in
22  favor of the prosecution, and must defer to that resolution."  *Id.* at 326.

23        Petitioner also argues that the evidence is insufficient to show an "immediate
24  prospect of execution" under Section 422, because he only spoke to the victim by
25  telephone while he and the victim were separated by a distance of ten miles.  [Doc. No. 1,
26  at pp. 23, 41; Doc. No. 11-1, at p. 9.]  However, this argument also goes to the weight
27  given conflicting evidence in the record as the victim testified she was afraid petitioner
28  would go to her house.  There is other evidence indicating that a relatively short distance

1  of ten miles was not enough to protect the victim from threat of violence. In addition,

2  California courts have also decided this issue against petitioner. For example, the

3  defendant in *People v. Gaut*, 95 Cal.App.4th 1425 (2002), called his girlfriend from jail

4  while he was awaiting his parole hearing and told her she was going to die. *Id.* at 1428-

5  1429. Fearing his release, the girlfriend went to the parole hearing and gave police a

6  recording of the defendant's telephone messages. *Id.* at 1429. Based on the recorded

7  messages, the defendant was convicted of making criminal threats under Section 422 and

8  appealed, arguing the evidence was insufficient as a matter of law, because he was

9  incarcerated when he made the threats. *Id.* at 1427. The California Court of Appeal

10 concluded the telephonic threats conveyed an immediate prospect of execution even

11 though he was incarcerated and was unable to immediately carry out the threats when he

12 made the calls. *Id.* at 1430-1432. *See also People v. Wilson*, 186 Cal.app.4th 789, 814-

13 819 (2010) (upholding conviction under Section 422 based on threats made by a prisoner

14 against a correctional officer that he would "blast" the correctional officer when he was

15 released from prison in ten months). Once again, issues of state law are not cognizable

16 on Federal habeas review. *Estelle v. McGuire*, 502 U.S. at 67-68.

17        Based on the evidence cited by the California Court of Appeal, a rational jury

18 could infer that petitioner specifically intended his words at the time in question to be

19 taken by the victim as a threat to carry out acts of physical violence against her that could

20 result in "death or great bodily injury." Cal. Penal Code § 422(a). A reasonable jury

21 could also conclude from the cited evidence that petitioner's statements to the victim at

22 the time in question were "so unequivocal, unconditional, immediate, and specific as to

23 convey to the [victim], a gravity of purpose and an immediate prospect of execution of

24 the threat" and that petitioner's words caused the victim to "be in sustained fear" for her

25 safety. Cal. Penal Code § 422(a). Accordingly, it is this Court's view that the California

26 Court of Appeal did not unreasonably apply the clearly established Supreme Court law

27 set forth in *Jackson v. Virginia*, 443 U.S. 307. Nor is the California Court of Appeal's

28

1 rejection of petitioner's sufficiency of the evidence argument contrary to clearly

2 established Supreme Court law as set forth in *Jackson v. Virginia.*

3 **III.    *Application of AEDPA Deference.***

4        The Petition also raises a procedural issue. Citing the Supreme Court's decision in

5 *Panetti v. Quarterman*, 551 U.S. 930 (2007), and the Ninth Circuit's decision in *Frantz v.*

6 *Hazey*, 533 F.3d 724 (9th Cir. 2008), petitioner argues that his sufficiency of the evidence

7 claim "must be reviewed outside of AEDPA deference." [Doc. No. 1, at p. 40.]

8 According to petitioner, the deferential standards set forth under AEDPA do not apply in

9 this case, because the California Court of Appeal's decision is based on an unreasonable

10 application of Federal law or on an unreasonable determination of the facts in light of the

11 evidence presented. In support of this argument, petitioner cites the alleged

12 "misstatements [or omissions] of fact" discussed in the previous section that he believes

13 are essential to evaluating the sufficiency of the evidence. [Doc. No. 1, at pp. 23-26, 40-

14 45; Doc. No. 11-1, at p. 8.]

15        In *Panetti v. Quarterman*, 551 U.S. 930, the Supreme Court concluded that a state

16 court's adjudication of a habeas petitioner's claim "resulted in a decision . . . that

17 involved an unreasonable application" of clearly established Supreme Court law under

18 Section 2254(d)(1). According to the Supreme Court, the state court's decision involved

19 an "unreasonable application" of clearly established Supreme Court law, because a full

20 and fair hearing was constitutionally required under the circumstances, but the state court

21 did not provide the petitioner with this procedural safeguard. As a result, the Supreme

22 Court agreed with the petitioner's argument that Federal habeas review of his

23 incompetency claim was "unencumbered by the deference AEDPA normally requires"

24 under Section 2254(d). *Id.* at 948-952. In other words, the petitioner was entitled to

25 consideration of his claim in Federal Court on the merits "without deferring to the state

26 court's finding of competency." *Id.* at 954.

27        Similarly, in *Frantz v. Hazey*, 533 F.3d 724, the Ninth Circuit concluded that a

28 state court's decision was "contrary to . . . clearly established Federal law, as determined

by the Supreme Court" under Section 2254(d)(1).  According to the Ninth Circuit, the state court misapplied clearly established Supreme Court law when it denied the petitioner's claim based on harmless error analysis, because the petitioner had a viable claim of structural error, which is not amenable to harmless error analysis.  733.  Guided by the Supreme Court's decision in *Panetti v. Quarterman*, 551 U.S. 930, the Ninth Circuit considered the petitioner's claim "*de novo*" without the deference normally required under AEDPA.  *Id.* at 735-739.

Here, the Supreme Court's decision in *Panetti v. Quarterman*, 551 U.S. 930, and the Ninth Circuit's decision in *Frantz v. Hazey*, 533 F.3d 724, do not apply.  For the reasons outlined more fully above in the preceding section of this Report and Recommendation, the decision of the California Court of Appeal in this case is not contrary to clearly established Supreme Court law.  Nor does the California Court of Appeal's decision involve an unreasonable application of clearly established Supreme Court law.  As noted above, the clearly established Supreme Court law for evaluating sufficiency of the evidence claims is set forth in *Jackson v. Virginia*, 443 U.S. 307.  The California Court of Appeal responded to petitioner's sufficiency of the evidence claim by applying a standard of review equivalent to the standard set forth by the Supreme Court in *Jackson v. Virginia* and reached a determination based on the evidence in the record that is objectively reasonable.  For the reasons outlined in the preceding section of this Report and Recommendation, neither the reasoning nor the result of the California Court of Appeal's decision in this case contradicts clearly established Supreme Court precedent.  Moreover, there is more than enough evidence in the record to support the jury's verdict even if petitioner's claim is considered under the standard set forth in *Jackson v. Virginia* without the deference required by AEDPA.  Accordingly, IT IS RECOMMENDED that the District Court REJECT petitioner's contention that his sufficiency of the evidence claim "must be reviewed outside of AEDPA deference."  [Doc. No. 1, at pp. 23-26, 40-45.]

/ / /

### *CONCLUSION AND RECOMMENDATION*

This Report and Recommendation is submitted to the assigned United States District Judge pursuant to Title 28, United States Code, Section 636(b), and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.

Based on the parties' moving and opposing papers and exhibits, IT IS HEREBY RECOMMENDED that the District Court issue an order: (1) approving and adopting this Report and Recommendation; and (2) directing that judgment be entered DENYING the Petition.

IT IS HEREBY ORDERED that no later than ***December 30, 2016*** any party to this action may file and serve written objections to this Report and Recommendation. The document should be captioned "Objection to Report and Recommendation.

IT IS FURTHER ORDERED that any reply to the objection shall be filed and served no later than ***January 16, 2017***. The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appear of this Court order. *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: November 23, 2016

Hon. Karen S. Crawford
United States Magistrate Judge

15cv2457-JAH(KSC)