UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| AARON PACHITO, | Case No.: 15cv2457-JAH (KSC) |
|---|---|
| Petitioner, | |
| v. | **ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |
| CYNTHIA Y. TAMPKINS, | |
| Respondent. | |

### INTRODUCTION

Pending before the Court is Aaron Pachito's ("Petitioner") Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. section 2254. Respondent filed an answer and Petitioner filed a traverse. Pursuant to 28 U.S.C. section 636(b)(1), the Honorable Karen S. Crawford, United States Magistrate Judge, submitted a Report and Recommendation ("Report") to this Court recommending this Court deny the petition. Petitioner filed objections to the Report. After careful consideration of the pleadings and relevant exhibits submitted by the parties, and for the reasons set forth below, this Court OVERRULES the objections, ADOPTS Judge Crawford's Report, DENIES the petition and DENIES a certificate of appealability.

//

//

# FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal's unpublished decision denying Petitioner's direct appeal:

Durae Delisle and [Petitioner] began a relationship in 2007, and she gave birth to their daughter, in 2009. [Petitioner] has a history of domestic violence toward Delisle, particularly when under the influence of alcohol.

In the Spring of 2008, he slapped her in the face after hearing a message a man left on her phone. A few months later, he threw a cup of coffee at her face. It split her lip and broke a front tooth, requiring a root canal. In December 2008, he came home from a sporting event 'very, very drunk,' 'went on and on' about how much he hated her religion, and struck her 'very hard' on the side of her head, popping her eardrum. As she lay on the floor crying, he kicked her and smashed her head several times into a cupboard. She went to urgent care, and had pain in her ear for two to three weeks and difficulty hearing.

On December 12, 2008, an officer with the San Diego Police Department responded to a call from Delisle. She had been crying, and she told the officer that she broke up with [Petitioner] a few days earlier and he 'wanted to physically fight with her and punch her face.' She reported the cup incident to the officer.

In February 2009, when Delisle was two months pregnant, [Petitioner] punched her in the stomach because he was upset about the pregnancy. About a month later, he became upset because she was crying while reading an e-mail. He was drunk, and he put both hands around her neck and choked her 'really bad' until she 'start[ed] to get dizzy.' He stopped for a few seconds, but then resumed choking her. She knew from experience that if she pretended to be calm, he would calm down.

On or about April 2010, [Petitioner] punched Delisle in the leg while she was seated on a bed with their daughter. He had agreed to stop drinking and abusing her. He was not drinking this time, which made her believe he would never stop the abuse. After this incident, she took her daughter and left the area for several months.

At one point, Delisle went to Seattle, Washington, and stayed with a friend. [Petitioner] joined her in Seattle and they spent the night in a hotel. The following day 'he got really mad that he was spending so much money on hotel rooms' when he could be staying at the friend's house. The friend was afraid of [petitioner] and Delisle promised not to reveal the friend's address to him. He screamed at her as she was driving, and she pulled over and told him to get out of the car. He refused. She

2

15cv2457-JAH (KSC)

went into a cafe and called the police because she was afraid of him. When the police arrived, he fled.

In September 2010, Delisle returned to San Diego because she wanted to get orders for custody and child support. In October 2010, she reported to a police officer that 'she got into an argument with her boyfriend, and he pushed her while she was holding their one-year-old daughter.' She told the officer '[s]he was afraid of him and ran out of the house to the neighbor's house next door and had the neighbors call 911.'

In January 2011, Delisle obtained a restraining order against [Petitioner]. According to Delisle, child protective services intended to remove their daughter from her custody unless she obtained one. Delisle and [Petitioner] agreed he would have reasonable visitation with their daughter.

[Petitioner] broke the restraining order by calling her 'nonstop' about resuming their relationship. She did not want to do so because he was 'drinking continuously,' and sometimes when he drank, he was 'very violent.'

In January 2011, Delisle reported to a police officer that he made 35 calls to her within a few hours. The officer arrested [Petitioner] for violating the restraining order. [Petitioner] told the officer he knew about the order, but he continued to call her because he needed to know whether or not she was dating someone else so that if she was, he could move on with his life.' He admitted to the officer that he had physically abused her.

In one of [Petitioner]'s calls to Delisle, he commented that he could pick the lock of her apartment door. That concerned her because she lived in 'a very old building' and 'it would have been so easy to break inside.' She asked the police to give her safety tips, and they helped her with window locks and showed her 'how to block a door with a chair.'

One night in February or March 2011, Delisle left her apartment to retrieve something from her car. [Petitioner] was outside her apartment, and he was 'very upset' because he had gotten into her e-mail account and saw she was corresponding with a man. He put one hand around her neck and choked her for approximately five seconds. After this incident, she obtained a criminal protective order against him.

The night of March 24, 2011, Delisle received between 10 and 15 phone calls while she was driving home. She believed they were from [Petitioner] and she ignored them. When she arrived outside of her apartment, she called him. She could tell from his tone of voice that he was 'very, very angry: angrier than usual.' He

3

wanted to see their daughter the following day, and Delisle had not called him for several days to schedule visitation.

During the call, [Petitioner] stated, 'You're lucky you called me, you fucking bitch, because I was just about to come over there and knock down your front door and murder you.' He added, 'I'm not going to hurt you, I'm going to murder you, and the restraining order is not going to protect you and the police aren't going to protect you.' He also said something to the effect of, 'Why the fuck didn't you answer your phone after I called you 10 times, you fucking bitch.'

Delisle knew [Petitioner] was at his home, which was approximately 10 to 15 minutes from her apartment by car. She testified, 'I was afraid he was going to come over,' and, 'when he's drinking, if he comes over to my house, it's not a good situation.' When asked whether he could be violent, she responded, 'Of course.' Further, child protective services had been at her home that morning, and she believed she should report the incident to avoid having their daughter being removed from her custody. Delisle testified child protective services had visited her three times after their daughter's name showed up in police reports pertaining to petitioner's conduct. She testified, 'I'm afraid of him. I'm afraid of child protective services. I'm afraid of there being proof that he's calling me and I'm not reporting it. I'm afraid of the whole situation. It's a nightmare.'

She decided to flag down a police officer to report the threats. She also decided to spend the night in a hotel, and as a 'safety precaution' she asked the officer, Cary Ochab, to escort her to her apartment and wait outside with her daughter while she grabbed some clothes. She returned home the next day and [Petitioner] left her alone for several months.

Officer Ochab testified Delisle 'appeared nervous, anxious, almost like physically shaking, like she was concerned about something.' His report stated she told him [Petitioner] said, 'Why the fuck didn't you answer the phone after I called you 10 times, you fucking bitch? I was about to come over and knock down your front door and kill you. I'm not going to hurt you, I'm just going to come over and murder you.'

While Delisle was speaking with Ochab, [Petitioner] phoned her. She put the call on speaker phone. She told [Petitioner] he should not be calling her, and he responded, 'I don't care if you have a restraining order. It can't protect you,' and, I'm not afraid of the police.' Ochab could 'hear a male's voice going on a rant, yelling and screaming over the phone, making some reference to seeing his daughter.' Ochab attempted to interrupt [petitioner] several times, but he 'continued with his yelling and screaming.'

4

15cv2457-JAH (KSC)

> Ochab later phoned [Petitioner] and 'asked him about the threat that he made and kind of cautioned him about making such threats, especially if he was concerned about child custody in the future.' [Petitioner] asked Ochab, 'am I going out with her, if I was fucking her.' [Petitioner] did not deny threatening Delisle, but said 'he would never hurt her.' [Petitioner] 'tended to agree ... that he should probably be a little more cautious with what he says towards Delisle.' He asked Ochab 'numerous times if I could just drop the case.'
>
> John Serrano, an investigator with the district attorney's office, conducted a recorded interview of Delisle in May 2011. When asked whether she denied being afraid of [petitioner], Serrano testified, 'No. She was definitely afraid of him.' He added, 'She said that she was constantly having to watch her back; she wasn't sure if he was perhaps sitting down the street, watching her come home, so she was definitely fearful of him.' Delisle told Serrano she was afraid to spend the night of March 24, 2011, at her home, 'and she said she wanted to spend the money [on a hotel room] to make sure that she was safe.'

Lodg. 5 (Doc. No. 10-17).

## PROCEDURAL BACKGROUND

On December 12, 2012, a jury convicted Petitioner of making a criminal threat in violation of California Penal Code Section 422. Lodg. 2, Reporter's Transcript ("RT") v. 11 (Doc. No. 10-13). Petitioner was sentenced to a total of eleven (11) years in state prison: three years for the violation of Section 422, doubled to six years because Petitioner had a prior conviction that qualified as a strike under California's Three Strike's law, and five years additional because Petitioner had a prior conviction that qualified as a serious felony under California Penal Code Section 677(a)(1). Lodg. 2, RT v. 12 (Doc. No. 10-14).

Petitioner appealed his conviction to the California Court of Appeal which affirmed the decision in an unpublished opinion filed on October 27, 2014. Lodg. 5 (Doc. No. 10-17). Petitioner raised the same arguments in a Petition for Review before the California Supreme Court. Lodg. 6 (Doc. No. 10-18). The California Supreme Court summarily denied the Petition on January 21, 2015. Lodg. 7 (Doc No. 10-19).

On October 28, 2015, Petitioner filed the instant Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2254 challenging his California state court conviction,

5

asserting an insufficiency of evidence claim in violation of the Fourteenth Amendment. Doc. No. 1. Respondent filed an answer and Petitioner filed a traverse. Doc. Nos. 9, 11.

Judge Crawford filed a Report recommending the Court deny the petition. Doc. No. 12. Petitioner filed objections to the Report. Doc. No. 13. Respondent did not file objections or a reply to Petitioner's objections.

## LEGAL STANDARDS

**I. Scope of Review of Report and Recommendation**

The district court's role in reviewing a magistrate judge's report and recommendation is set forth in 28 U.S.C. section 636(b)(1). Under this statute, the district court "shall make a de novo determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]." 28 U.S.C. section 636(b)(1). When no objections are filed, the Court may assume the correctness of the magistrate judge's findings of fact and the district court is not required to conduct a de novo review of the magistrate judge's report and recommendation. *See Wang v. Masaitis*, 416 F.3d 992, 1000 n. 13 (9th Cir. 2005) (stating that "de novo review of a R & R is only required when an objection is made"); *United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*) (holding that 28 U.S.C. section 636(b)(1)(c) "makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise").

**II. Scope of Review of Federal Habeas Petition Pursuant to 28 U.S.C. 2254**

Under Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court will not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the decision was: (1) contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002). That standard under AEDPA is difficult

to meet and "demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotes omitted).

A federal court may grant habeas relief where the state court decides a case "contrary to" federal law by applying a rule different from the governing law set forth in Supreme Court cases or decides a case differently than the Supreme Court on a set of indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A court may also grant habeas relief where a state court decision is an unreasonable application of clearly established federal law, such as where the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies those decisions to the facts at issue. *Id*. at 407. The state court decision must be more than incorrect; to warrant habeas relief the state court's application of "clearly established federal law" must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "Objectively unreasonable" differs from "clear error" in that a federal court cannot grant relief only because it believes the state court erroneously applied clearly established federal law; rather, the application must be objectively unreasonable. *Id*. at 75-76 (internal citation omitted).

If a state supreme court silently denies a petitioner's appeal with a summary dismissal, the reviewing federal habeas court must review the last reasoned state court opinion in making a decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04, 806 (1991). Where the state courts supply no reasoned decision on the claims presented for review, this Court must perform an "'independent review of the record' to ascertain whether the state court decision was objectively unreasonable." *Himes v. Thompson*, 336 F. 3d 848, 853 (9th Cir. 2003) (internal citations omitted).

## DISCUSSION

### I. Petitioner's Claim

Petitioner asserts he was denied due process under the Fourteenth Amendment because there is insufficient evidence to support his conviction. Initially, Petitioner contends the State's ruling is not entitled to AEPDA deference because it omitted or

7

misinterpreted facts essential to evaluation of the sufficiency of the evidence. If AEDPA applies and the state court accurately assessed the facts, he contends the words he spoke during the phone call at issue do not establish the elements of a criminal threat. Specifically, he argues the evidence was insufficient because the words did not convey an immediate threat and were expressly conditional to a past event. If AEDPA does not apply, Petitioner argues the result is the same because the evidence does not support a finding beyond a reasonable doubt.

Respondent argues Petitioner cannot demonstrate the state court's rejection of his claim that there was insufficient evidence to support his conviction was contrary to, or an unreasonable application of, controlling United States Supreme Court authority or the facts presented. To the extent Petitioner challenges the state court's interpretation of California law and its conclusion that the statute does not require an unconditional threat, Respondent argues this Court is bound by the state court's determination and is limited to determining whether the state court's construction of the evidence and application of Supreme Court law was error.

### A. Report and Recommendation

In the Report, Judge Crawford found Petitioner challenges the California Court of Appeal's interpretation of section 422 as contrary to California law. Citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991), Judge Crawford determined Petitioner's argument regarding the interpretation of section 422 is an issue of state law, and as such, is not cognizable on federal habeas review.

Judge Crawford further found Petitioner's arguments that the Court of Appeal focused on some of his statements while ignoring others and made factual omissions, including the victim's conflicting testimony, presents conflicts in the evidence and challenges to the weight of the evidence. Relying on the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), Judge Crawford reasoned the court could not reweigh the evidence or resolve any conflicts but must presume the jury resolved any conflicts in favor of the prosecution.

8

Judge Crawford determined that a rational jury could infer that Petitioner specifically intended his words at the time in question to be taken by the victim as a threat to carry out acts of physical violence against the victim, possibly resulting in death or bodily injury and could also conclude from the evidence that Petitioner's statements to the victim at the time in question were "so unequivocal, unconditional, immediate and specific as to convey to the victim a gravity of purpose and an immediate prospect of execution of the threat" and Petitioner's words caused the victim to "be in sustained fear" for her safety. Report at 15 (Doc. No. 12). As such, Judge Crawford concluded the California Court of Appeal did not unreasonably apply the clearly established Supreme Court law set forth in *Jackson* and the California Court of Appeal's rejection of Petitioner's sufficiency of the evidence argument was not contrary to clearly established Supreme Court law.

Additionally, Judge Crawford recommended this Court reject Petitioner's contention that his claim be reviewed outside of AEDPA deference determining the Supreme Court's decision in *Panetti v. Quarterman*, 551 U.S. 930, and the Ninth Circuit's decision in *Frantz v. Hazey*, 533 F.3d 724, do not apply.

## B. Petitioner's Objections

Petitioner objects to the Report and argues Judge Crawford incorrectly frames his arguments as challenging the court's interpretation of California law. He maintains he is not challenging California definitional law of the elements of section 422 and he did not assert that under California law the threat had to be solely unconditional.

Petitioner also objects to Judge Crawford's determination that he relies on disputes in the evidence. He maintains the Report views the context of the call as conflicts in the record and improperly focuses on the out of context fragments of the statement to support an immediate threat.

He also challenges the Report's determination that a court must presume the trier of fact resolved conflicting inferences in favor of the prosecution. Petitioner maintains the due process doctrine accepted in the First, Second, Fifth, Seventh and Eleventh circuits holds that if an equal or nearly equal theory of guilt and a theory of innocence is supported

by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt.

**C. Analysis**

While Judge Crawford correctly explained a challenge to the Court of Appeal's interpretation of state law is not cognizable on habeas review, Petitioner now clarifies he does not challenge the definition of the offense. Instead, he explains he argues the evidence does not meet the constitutional minimum for proof of the elements. Specifically, he argues there is insufficient evidence to support his conviction because the threat was not "so clear, immediate, unconditional and specific that it communicated to [the victim] a serious intention and the immediate prospect that the threat would be carried out" and "that the threat actually caused [the victim] to be in sustained fear for her own safety or for the safety of her immediate family." Objection at 2-3 (Doc. No. 13). He contends his words did not convey the prospect of immediate action because they were partially conditional in that he said she was lucky she called him back because he was about to go to her home and kill her but he will not because she called him. Moreover, Petitioner contends his statements could not impose a threat of immediate harm or death because his intention behind his phone call was to discuss seeing his daughter. He maintains the California Court of Appeal unreasonably pulled a fragment from the middle of the statement at issue to artificially give it present tense meaning of a true threat.

The Court of Appeal recognized that it was required to review the entire record in the light most favorable to the judgment and determine whether a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt based upon the evidence. Lodg. 5, Opinion at 9 (Doc. No. 10-17). The court found the circumstances supported the conviction even with Petitioner's use of conditional language. *Id*. at 13. Relying on *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011), Petitioner argues the Court of Appeal could not embellish the words to make the law reach them and argues he was not saying he was going to murder the victim and she did not fear he would do so. "When our law punishes words, we must examine the surrounding circumstances to discern the

significance of those words' utterance but must not distort or embellish their plain meaning so that the law may reach them." *Id*. This Court finds the Court of Appeal did not embellish or distort the words. As discussed below, the Court of Appeal reviewed the plain meaning of the words and looked to the context in finding a trier of fact could find guilt beyond a reasonable doubt.

Petitioner maintains the undisputed context of the entire statement demonstrates it conveyed no immediate threat and points to the victim's testimony that she did not feel like she was in danger at the moment and she wrote a letter to Petitioner's attorney stating she did not take his words literally and she did not feel Petitioner was going over to her home that night. However, the Court of Appeal pointed to evidence of record, including the victim's testimony in finding the circumstances support the conviction. Petitioner appears to challenge the court's reliance on certain evidence and omission of other evidence in its decision.

The Report addresses Petitioner's argument that the Court of Appeal improperly focused on some of his statements while ignoring others and found, at most, Petitioner cited conflicting evidence in the record. Judge Crawford determined, under the standard of review set forth in *Jackson*, a reviewing court cannot re-weigh the evidence but, rather, must presume that the trier of fact resolved any conflicts in favor of the prosecution.

Petitioner objects maintaining there is no conflict concerning the context of the call. Petitioner argues the only conflict is the victim's testimony which he describes as "varying." He maintains the evidence demonstrates Petitioner made many unanswered calls to the victim because he wanted to see his child and the victim knew Petitioner would become angry when she did not answer his calls. He also maintains the evidence demonstrates they were miles apart when Petitioner made the call and the physical separation supports the unreasonableness of a fear of immediate threat of great bodily harm. Additionally, Petitioner points to the evidence that the call concluded with a discussion about his visitation with his daughter and that he denied he intended to harm the victim when questioned by Officer Ochab. Petitioner also contends the victim was fearful

11

of losing her child if Child Protective Services ("CPS") found out she had contact with Petitioner rather than fear Petitioner was coming to harm her. In support, he points to evidence that CPS visited her earlier in the day and she was told she could have no contact with Petitioner. Petitioner further contends the victim had an agenda, in that she wanted Petitioner to register their daughter with his Indian tribe to receive monetary benefits but Petitioner failed to do so. He also maintains the victim later re-initiated a relationship with Petitioner. He argues the undisputed context demonstrates his words in the telephone call were not a punishable criminal threat because, in context, they were not so unequivocal or unconditional as to convey a gravity of purpose and immediacy of execution.

In addition to the evidence Petitioner relies upon, there is testimony and evidence that supports that his threatening statement conveyed an immediate prospect of execution of the threat to the victim and put her in sustained fear for her safety or that of her family. The victim testified she wanted the police officer to escort her home because she was concerned Petitioner may show up and could become violent based upon the threat and the history of violence during their relationship. Lodg. 2, RT v. 8 184:3-186:19 (Doc. No. 10-10). Additionally, the Court agrees that whether the victim had a sustained fear for her safety in light of the 10-mile distance between she and Petitioner at the time of the call goes to the weight of the evidence.

This Court agrees with Judge Crawford's reliance on the direction in *Jackson* that a court reviewing a federal habeas petition "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." 443 US at 326. Petitioner asks the Court to utilize an alternate due process analysis in resolving conflicts in the evidence. Relying on court decisions from the First, Second, Fifth, Seventh and Eleventh circuits, Petitioner contends after viewing the evidence in the light most favorable to the verdict, this Court should reverse the conviction if the evidence gives equal circumstantial support to a theory of guilt and a theory of innocence, because a reasonable jury must necessarily entertain a

reasonable doubt. As noted by Petitioner, the Ninth Circuit does not utilize this alternate analysis and this Court is not persuaded that this analysis is proper on this habeas review.

The Court also agrees with and adopts Judge Crawford's recommendation that this Court should reject Petitioner's contention that his claim be reviewed outside of AEDPA deference. Petitioner maintains the Court of Appeal's ruling is not entitled to AEDPA deference because it omitted facts and misinterpreted facts essential to evaluation of the sufficiency of the evidence. However, as discussed above, the Court of Appeal opinion is not contrary to clearly established Supreme Court law and does not involve an unreasonable application of clearly established Supreme Court law. Furthermore, the Court agrees with Judge Crawford's determination that there is sufficient evidence to support the verdict even without the deference required by AEDPA.

Accordingly, Petitioner's objections are OVERRULED. The Court ADOPTS the Report and DENIES the petition.

## II. Certificate of Appealability

Pursuant to Rule 11 of the Rules following 28 U.S.C. section 2254, which was amended effective December 1, 2009, a district court now "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A state prisoner may not appeal the denial of a section 2254 habeas petition unless he obtains a certificate of appealability from a district or circuit judge. 28 U.S.C. § 2253(c)(1)(A); *see also United States v. Asrar*, 116 F.3d 1268, 1269–70 (9th Cir. 1997) (holding that district courts retain authority to issue certificates of appealability under AEDPA). A certificate of appealability is authorized "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this threshold showing, petitioner must show: (1) the issues are debatable among jurists of reason, (2) a court could resolve the issues in a different manner, or (3) the questions are adequate to deserve encouragement to proceed further. *Lambright v. Stewart*, 220 F.3d 1022, 1024–25 (9th Cir. 2000) (citing *Slack v. McDaniel*, 529 U.S. 473 (2000)).

The Court finds no issues are debatable among jurists of reason. This Court further finds no issues could be resolved in a different manner. Lastly, this Court finds no questions are adequate to deserve encouragement to proceed further. Accordingly, this Court DENIES Petitioner a certificate of appealability.

**CONCLUSION AND ORDER**

Based on the foregoing, IT IS HEREBY ORDERED:

1. Petitioner's objections to the Magistrate Judge's report and recommendation are **OVERRULED.**
2. The Magistrate Judge's report and recommendation is **ADOPTED.**
3. The petition is **DENIED** in its entirety.
4. Petitioner is **DENIED** a certificate of appealability.

DATED: June 3, 2021

JOHN A. HOUSTON
United States District Judge